## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| EARNEST ROWLEY JR., | ) | CASE NO. 4:06CV3125 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MEMORANDUM |
| | ) | AND ORDER |
| MICHAEL J. ASTRUE, Commissioner | ) | |
| of the Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

This case is on appeal from the final decision of the Commissioner of the Social Security Administration denying social security benefits to Plaintiff Earnest Rowley Jr. pursuant to 42 U.S.C. § 1383(c)(3). Rowley alleges disability due to degenerative disc disease, past history of a neck injury resulting in a cervical fusion being performed in 1999, chronic neck and right upper extremity pain, cervical stenosis, failed back surgery syndrome, lumbar spondylosis and a history of depression.

### PROCEDURAL HISTORY

On June 3, 2003, Rowley filed his application for supplemental security income ("SSI") under Title XVI of the Social Security Act (hereafter "Act"), 42 U.S.C. §§ 1381 et seq. (Tr. 87-90). His application was denied initially and on reconsideration. Rowley then requested a hearing before an administrative law judge. (Tr. 32-35, 40-49). On June 15, 2005, following the hearing, the ALJ issued her determination that Rowley is not disabled as defined in the Act. (Tr. 15-28). On April 7, 2006, the Appeals Council denied Rowley's request for review, rendering the ALJ's decision the final decision of the Commissioner. (Tr. 7-9).

## FACTUAL BACKGROUND

Earnest Rowley was born on April 11, 1956, and was 48 years of age at the time of the hearing. He has obtained his GED. (T 537-538)  While he was doing construction work in 1996, Rowley injured his neck when he fell into a hole.  (Tr. 238-52, 260).  He has experienced pain in his cervical region and elsewhere since about 1998.   The Administrative Law Judge found that Rowley has no past relevant work, though Rowley testified that he has previous work experience in the construction industry, as a driver, and delivering newspapers.  (Tr. 19, 110- 117,  541-44).

Rowley is married and has two teen-aged children.  Due to his back pain, Rowley states that he is unable to sit, stand, or perform any type of repetitive movement without increasing his pain level.  He experiences tingling in his hands and loss of grip strength. He testified that the pain in his back causes him to be unable to bend over and he has problems with his left leg going numb.

At the hearing, Rowley testified that he is unable to perform the activities of daily living.  (Tr. 550, 551, 554, 557, 560).  For example, he testified that he must take naps throughout the day and that he needs his children's assistance to complete most household chores.  While he can drive for about one hour at a time, he stated that driving bothers him because it requires him to turn and twist his neck, which increases his neck pain.  Rowley completed written reports on his activities of daily living on October 22, 2004, and on June 19, 2003 (Tr. 118 –122; 152-156).   In these documents, Rowley stated that he had difficulty performing routine household chores, that he needed help from his family, and that he was having problems with the limited tasks he attempted.  In medical reports, he has informed his treating physician that he has experienced tingling and numbness in

2

his arms after carrying a basket of laundry up stairs, and that he has had difficulty sitting up from a prone position.

Rowley's spouse, Catherine Rowley, who testified at the hearing, stated that Rowley also has memory problems and difficulty focusing. (Tr. 569-571). She corroborated his need for napping and sleep. She expressed concern about whether he was suffering from depression, but on the two occasions his treating physician assistant screened for depression, the results were negative. His mother-in-law stated that he does not take walks and that he requires much sleep. (Tr. 159).

**Medical History and Medical Record Evidence**

Rowley has obtained much of his medical care through physicians employed at the Veterans Administration (hereafter "VA") Hospital and Primary Care Clinics. Rowley was first examined for neck pain by VA neurosurgeon Charles Taylon, M.D., on March 30, 1999. At the time, Rowley was experiencing pain in his neck and left upper extremity. Rowley reported that the pain had become increasingly worse. An MRI revealed severe stenosis at C4-5 and C5-6, worse at the C5-6 level, with disc herniation at C5-6. (Tr. 375). On April 23, 1999, Dr. Taylon performed a C5-6 diskectomy with fusion on Rowley's neck. (Tr. 261-62). He called the nurse to answer his questions about home care.

In follow up to the surgery, Dr. Taylon examined Rowley twice. On July 13, 1999, he determined that Rowley could return to work for limited duty with a lifting restriction of 35 pounds for the following three months. On August 17, 1999, Dr. Taylon noted that Rowley appeared to be "doing well" but had "minor residuals." (Tr. 368).

In February 2000, Rowley presented to the VA Primary Care Clinic. Rowley was treated during all material times by Physician Assistant ("PA") Bruce Wagner. Rowley

3

asked PA Wagner for new pain medication because the 600 mg. of ibuprofen previously prescribed to him was no longer working.  Wagner prescribed Naproxen. (Tr. 304-05).  On April 19, 2000, Rowley called again, complaining of pain, and Wagner prescribed Darvocet. (Tr. 303).

On May 13, 2000, the day after moving some boxes, Rowley called the Primary Care Clinic complaining of a dramatic increase in pain along the neck and back and down his left leg.  He explained that ice was not helping and that he could not sleep through the pain.  (Tr. 301-2).  He was referred to Bryan LGH Medical Center with complaints of dull stiffness and aching in his neck and trapezius area.  (Tr. 254).  On examination, Rowley showed no radiculopathy nor neurological deficits, but he had tenderness in the cervical paraspinous musculature, trapezius musculature, lateral aspects of the chest wall, and in the deltoid biceps.  The emergency physician diagnosed musculoskeletal chest wall pain, trapezius strain, bicep and deltoid strain, and intermittent paresthesias.  (Tr. 255).  He prescribed anti-inflammatory medications and Percocet for pain.  (Tr. 255).  Four days later, Rowley returned to PA Wagner.  He continued to have pain in the upper body and the neck.  The bicep reflexes were 2/4.  Wagner ordered a cervical MRI. (Tr. 300).

The May 30, 2000, MRI showed abnormalities at each level from C4 to T1.  The MRI showed a left paracentral disc herniation at C4-5.  The radiologist reports "It impinges upon the left C5 nerve root."  The MRI showed moderate to severe spinal stenosis; at C5-6, there was severe stenosis and either an osteophyte or a  desiccated disc fragment causing deformity of the cord but no evidence of nerve root impingement; and at C7-T1 there was a bulging disc that "slightly deforms the cord" without evidence of nerve root impingement.  (Tr. 312-13).  On June 7, 2000, Rowley called PA Wagner's office for the

4

results of the MRI, even though they had been read by the radiologist on May 30, 2000. During the same call, Rowley requested a refill of his prescription medications.

On June 15, 2000, Rowley went to PA Wagner who reviewed the MRI results. The records do not indicate the nature of the discussion, only that Rowley's pain medications were refilled and he was told to return in four months.

On July 18, 2000, Rowley returned to Dr. Taylon with complaints of residual neck pain. (Tr. 366). Dr. Taylon opined that Rowley was "totally disabled for construction work," and he made permanent his previous work restriction of no lifting more than 35 pounds, and no twisting or repetitive bending. (Tr. 366). A month later, Rowley contacted the VA Primary Care Clinic asking for more help with his pain. On August 23, 2000, Wagner examined him again, at which time Rowley explained that he was unable to sleep because of the pain, and that he had bad side effects from certain combinations of his medications or if he increased the dosage of the Naproxen. His medications were changed to include Darvocet and Cytotec.

In March 2001, the Primary Care Clinic was contacted to provide information in support of Rowley's application for a handicapped parking sticker, which Wagner refused to provide, noting that Rowley would be better served by the additional walking. (Tr. 292). When Rowley returned to PA Wagner on April 30, 2001, Rowley complained that when he carried a laundry basket upstairs, he feet tingling and numbness in his arms. On that date, Rowley was taking Amitryptaline, cycobenaprine, hydrocodone with acetominophine and Naproxen, and a medication for his stomach.

5

On May 22, 2001, Rowley returned to Dr. Taylon with complaints of pain in his left leg.  (Tr. 283).  EMG and nerve conduction studies revealed no abnormalities.  (Tr. 283-86).  Dr. Taylon recommended physical therapy, which Rowley declined.  (Tr. 283).

On July 30, 2001, Rowley returned to the VA Primary Care Clinic with complaints of low back pain and leg numbness.  (Tr. 280-81). On examination, PA Wagner noted lumbar spine tenderness.  A depression screen administered that day was negative. He was continued on several prescription medications to manage the pain: Amitriptyline, Cyclobenzaprine (the generic form of the muscle relaxant Flexeril), Naproxen, and Hydrocodone.  (Tr. 280-81).  On August 6, 2001, Rowley continued to complain of weakness and pain in his legs, and Wagner ordered an MRI of the lumbar spine.

An August 9, 2001, MRI of the lumbar-spine found minor abnormalities, including mild degenerative disc disease at L4-5 and L5-S1, a broad-based bulge with a likely annular rent at L4-5, and a disc bulge at L3-4.  (Tr. 311).

On November 20, 2001, Rowley returned to Dr. Taylon with complaints of pain in his neck and low back, and numbness in his left leg.  (Tr. 277).  On examination, he could heel and toe walk without difficulty, and he had 5/5 muscle strength in all muscle groups (Tr. 277).  This 5/5 strength measurement did not meaningfully change throughout the course of his treatment through the hearing date.   Dr. Taylon reviewed the MRI of the lumbar spine and found it negative. He recommended physical therapy and mentioned consideration of a pain clinic.   (Tr. 277).

Within a week after his appointment with Dr. Taylon, on November 26, 2001, Rowley called PA Wagner for a referral to the pain clinic.  (Tr. 276).  He stated on that day that his pain was very intense, prevented him from sleeping, and that the medications that used

6

to afford him some pain relief were no longer working.  (Tr. 276).  On January 10 and 18, 2002, Rowley called for refills of his pain medications, only the second refill because the Hydrocodone was not filled the first time around (Tr. 275).  On April 30, 2002, Rowley telephoned Wagner's office complaining of neck pain, and he explained that he had less pain control with the codeine.  He also complained of left chest pain, and so he was scheduled for an appointment the next day.  On May 1, 2002, he was put on Cytotec. Rowley's main complaint was chest wall pain and back pain worsening with changes in the weather.  Rowley told Wagner that he was in pain when his 13-year-old hugged him, and that it was hard for him to sit up from a prone position.  Another depression screen was negative.  (Tr. 273-74).  Rowley returned to Dr. Taylon on May 21, 2002.  He reported experiencing persistent neck pain.  (Tr. 272).  Nerve conduction studies of his lower extremities and a lumbar-spine MRI were normal despite his complaints of low back pain and left leg weakness.  (Tr. 272).  Dr. Taylon asked Rowley to return for a follow-up in a year.  (Tr. 272).  On June 6, 2002, Rowley requested another refill of his prescriptions.

On July 19, 2002, Rowley returned to the VA Primary Care Clinic reporting a loss of sensation in his hands and neck pain.  (Tr. 268-70).  Wagner ordered a cervical spine MRI, and he prescribed Amitryptaline and Etodolac. (Tr. 268-69).  The radiologist who read the MRI scan taken on July 23, 2002, characterized it as "not significantly changed from previous study of 5/30/00," though it continued to show the prior fusion at C5-6 with diskectomy, left paracentral focal protrusions at C4-5 and C6-7, and anterior to posterior narrowing from C4 through C7.  (Tr. 309-10).

On August 2, 2002, Rowley returned to the VA with complaints of day-time sleepiness.  (Tr. 266).  On examination, he reported a pain level of only 2/10.  (Tr. 267).

7

Physician Assistant Wagner continued the cycobenzaprine and Piroxicam prescriptions. (Tr. 266). Rowley's condition was stable and his pain managed throughout most of August. On August 27, 2002, Rowley told Wagner that he was doing well, and that the prescription medications were helping. (Tr. 263). His history on that date included that he had recently canned 20 quarts of tomatoes, and that he walked as much as one-half mile from his home. (Tr. 263). The Cycobenaprine and Piroxicam were refilled. (Tr. 263). However, within two months his pain returned. On October 18, 2002, Rowley returned to Wagner complaining of increased pain, stiffness, and muscle spasm in his neck. (Tr. 457-58). Wagner started Rowley on Trazodone and referred him to the Pain Clinic. (Tr. 456). There is some indication that Rowley was to have an appointment at the VA Pain Clinic in January 2003, but it appears from the records that the first VA Pain Clinic appointment was not until April 2003.

On December 5, 2002, Rowley presented to Scott McPherson, M.D., for a consultative examination. (Tr. 391-98). Rowley reported that he no longer had a "great deal of low back or extremities pain," but that he continued to have "pain in the upper cervical spine into the skull region." (Tr. 391). Although he stated that walking and driving were difficult, he admitted he could walk slowly if he was careful. (Tr. 392). On examination, Dr. McPherson found some mild tenderness in the upper cervical spine, but no muscle atrophy in his cervical spine or shoulders. (Tr. 394). Dr. McPherson found Rowley's lumbar musculature appeared normal without evidence of atrophy, and he ambulated normally. (Tr. 394). Dr. McPherson remarked that Plaintiff was "quite strong" in all muscle groups with no evidence of atrophy, and thus it appeared that he was continuing to be "physically active to a certain degree." (Tr. 396). Dr. McPherson

8

suggested that Rowley would benefit from some type of pain management therapy.  (Tr. 395-96).

On December 16, 2002, Rowley returned to the VA Primary Care Clinic with complaints of neck pain and trouble sleeping.  (Tr. 451-52).  Wagner prescribed Hydrocodone.  (Tr. 452).  After a month on the Hydrocodone, Rowley said that he was "doing better."  (Tr. 446-48).

The medical record shows that consideration was given to admitting Rowley to a pain clinic in January 2003, but his initial evaluation at the VA Anesthesia Pain Clinic did not occur until April 2, 2003.  (Tr. 444).  Rowley provided a history of neck and right upper-arm pain that was only partially relieved with Cyclobenzaprine and Hydrocodone. (Tr. 444).  On examination, the pain clinic's nurse practitioner, Christianne Claassen, who was practicing under the supervision of Scott Hofmann, M.D.,  found that Rowley was well-developed, was in no acute distress, and possessed 5/5 strength in his upper extremities.  (Tr. 444-45).  NP Claassen also recorded that examination revealed muscle spasms in Rowley's trapezius bilaterally.   The treating nurse practitioner, Christine Claassen, started Rowley on Gabapentin, a generic form of Neurontin, and told him to follow-up in two to three months (Tr. 445).

Although the medical records indicated that Rowley was to return for follow-up with Dr. Taylon in December 2003, he requested an earlier appointment and the VA permitted a neurosurgery referral after just six months.  On May 20, 2003, he reported to Dr. Taylon that the Gabapentin was not working.  (Tr. 443-44).  Rowley also told Dr. Taylon that he continued to have low back pain.  (Tr. 444).  On examination, Dr. Taylon noted that Rowley could walk on his heels and toes, and found his neurological status was stable.  He did not

9

recommend additional surgery.  (Tr. 444).  A few days later, on May 23, 2003, Rowley returned to the Primary Care Clinic, presenting with complaints of fatigue and low back pain.  PA Wagner recommended altering the timing of his Gabapentin dosage.  (Tr. 441-43).

Wagner's alteration of the Gabapentin dosage appears to have helped, because when Rowley returned to the VA pain clinic on June 11, 2003, he stated that the Gabapentin had helped his neck and upper extremity pain (Tr. 439).  Though he continued to have occasional pain, it was not as severe as it was prior to taking the Gabapentin.  He continued to have pain with weather changes, and asked for treatment options relative to that.  (Tr. 439).  Although his strength remained at 5/5, Claassen prescribed Naprosyn, as needed, for pain relief.  (Tr. 440).  An MRI of the lumbar spine revealed no new changes.  (Tr. 459-60).

 On June 19, 2003, Rowley completed a Daily Activities Report, in which he reported that he could perform the "kitchen duties," vacuum, and "run to the grocery store."  (Tr. 152-53).  He also indicated that he could drive 50 miles before needing to stop because of neck pain. (Tr. 152).

On July 8, 2003, Plaintiff returned to PA Wagner with complaints of neck pain (Tr. 437-39).  Rowley's medications were refilled.  (Tr. 438-39).  Between July 18, 2003, and July 28, 2003, he attended physical therapy three times for treatment of his neck pain, but he was discharged on September 8 because he cancelled and failed to reschedule the next appointment.  (Tr. 430-35).

On September 19, 2003, Rowley advised PA Wagner that his pain increased with changes in the weather, and that he was unable to perform even minimal household

10

chores.  (Tr. 429).  On November 10, 2003, Rowley returned  with complaints of left thigh numbness that was worse with hip flexion (Tr. 425-26).   PA Wagner refilled his prescription pain medications:  Amitryptaline, Cycobenaprine, Gabapentin, and Hydrocodone.  (Tr. 425).  A December 9, 2003, cervical-spine MRI revealed no significant changes.  (Tr. 501-02).  On February 17, 2004, Rowley returned for follow up to the VA Primary Care Clinic and told PA Wagner that he was not doing too bad, and that the sunny weather was making him feel better.  (Tr. 498-99).  Rowley reported a 0/10 pain level on that visit.  (Tr. 499).

On July 19, 2004, Rowley returned to PA Wagner with complaints of low back pain following a fall down the stairs six weeks prior to the visit.  (Tr. 490).  PA Wagner refilled Rowley's medications.  (Tr. 491).  On August 10, 2004, Rowley presented to Dr. Taylon for a neurosurgery examination.  (Tr. 489-90).   Rowley reported that he was having only intermittent episodes of neck pain and that he experienced numbness in his arm while he was gardening.  (Tr. 489). Following examination, Dr. Taylon recorded that Rowley's condition was stable, and that no further surgery was indicated. (Tr. 489).

On August 20, 2004, Rowley was seen at the emergency room after he reportedly fell down the stairs the previous day.  He complained of a marked increase in back pain and had muscle spasms throughout his back. He was able to walk normally.  Though X-rays revealed no fractures, they showed mild-to-moderate spondylosis. (Tr. 500).   He received a Toradol injection for pain.    (Tr. 485-88).  On September 9, 2004, Rowley returned to the Anesthesia Pain Clinic with neck pain (Tr. 484).   He advised that Gabapentin had helped some, and he requested an increase in his Hydrocodone dosage. (Tr. 484).  On examination, Rowley was not in acute distress, and his muscle strength was

11

normal throughout his upper extremities. (Tr. 484). Ms. Claassen prescribed Hydrocodone and an increased dosage of Gabapentin, and she discussed the option of treatment at a Pain Clinic in Florida. (Tr. 484).

Rowley returned to the Primary Care Clinic in October 2004 with complaints of neck and back pain. (Tr. 478-80). PA Wagner continued Rowley on the same prescription medications. (Tr. 478-80).

## ALJ DECISION

The ALJ determined that Rowley has not worked since the alleged onset date, that he has severe impairments within the meaning of the Social Security Administration Regulations, specifically "discogenic and degenerative disc disease of the cervical and lumbar spine (status post cervical fusion). The ALJ also found that the claimant's allegation of depression was "not severe" under the Social Security Act. (Tr. 22). The ALJ also determined that his disabilities to not meet or equal any of the so-called "Listings," and that he could not return to any of his past relevant employment. Given those determinations, the ALJ analyzed Rowley's credibility in order to assess his residual functional capacities.

The ALJ found that Rowley's "medically determinable impairments could reasonably be expected to produce the type of symptoms described during the course of his testimony," and so she directed her attention to "whether the claimant experiences symptoms in such intensity, and of such frequency and duration, as would preclude all types of substantial and gainful work activity." (Tr. 24). In responding to that question, the ALJ made four findings that she considered in determining that Rowley's testimony "insofar as it pertained to the inability to perform virtually any type of work activity on a sustained

12

basis, was not credible."  (T 25).  The four findings are: 1) "objective findings have failed to substantiate the intensity and persistence of his symptoms," noting "there are no findings consistent with nerve root impingement that would 'reasonably impair' his ability" to sit, stand, or walk;  2) Dr. Taylon, whom she called the "longitudinal treating physician" placed work restrictions upon Rowley but none of them prevented him from working at the light level of exertion;  3) Rowley was referred to physical therapy, but he did not follow through on treatment recommendations; 4) Rowley has stated that he is able to perform certain routine household chores, (i.e., vacuuming and tending to 'kitchen duties') without significant difficulty, and is able to drive up to 50 miles before needing to stop and stretch.  (Tr. 24)

The ALJ determined that Rowley had the residual functional capacity to do the following:

> lifting, carrying objects weighing up to 20 pounds occasionally, 10 pounds frequently; sit about 6 hours within an 8 hour work day; stand/walk about 6 hours within an 8 hour work day; and occasionally, but not repetitively, perform postural tasks including climbing ramps and stairs, balancing, stooping, kneeling, crouching, and crawling.  He is to avoid performing tasks involving climbing ladders, ropes, or scaffolds and avoid overhead reaching other than on an occasional basis, as well as avoid exposures to cold temperatures and vibration.

(Tr. 25).

Based on the RFC as determined by the ALJ and the expert witness testimony provided by the vocational expert Michael McKeeman, the ALJ determined that there were a significant number of light duty jobs generally available in the local and national economy that Rowley was able to perform.  For that reason, the ALJ determined that he is not disabled under the Act.

13

**ISSUES PRESENTED**

Rowley contends that the ALJ failed properly to apply the applicable regulations and standards in assessing his credibility.  He contends that even through the ALJ used language and referred to appropriate rules and law, expressly citing *Polaski v. Heckler,* 739F.2d 1320 (8th Cir. 1984) and Social Security Ruling 96-7p, she failed properly to analyze the *Polaski* factors in evaluating the credibility of Rowley's testimony.  The ALJ's credibility determination is key, Rowley contends, because the vocational expert ("VE") opined that if Rowley's subjective complaints were taken as true, he would not be able to engage in substantial gainful employment.

With regard to the specific factors, Rowley contends that the ALJ failed to:

1)   review all material medical records for medical signs and laboratory findings that support his complaints;

2)   consider all material diagnoses, prognoses, and other medical opinions provided by treating or examining physicians, though Rowley concedes that the ALJ considered the work restrictions imposed by Dr. Taylon;

3)   review the reports that were completed by the claimant and his family, such as the Daily Activity reports;

4)   analyze evidence demonstrating that his repeated efforts at seeking pain relief; and

5)   accurately describe and analyze his daily activities, including that he needs to nap during the day and that it was estimated that he is not able to function at all on the average 10 days out of a month.

(Filing No. 15).

14

## ANALYSIS

This Court will "affirm the ALJ's findings if supported by substantial evidence on the record as a whole. Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision. The review . . . is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision, [the Court must ]. . . also take into account whatever in the record fairly detracts from that decision." *Beckley v. Apfel,* 152 F.3d 1056, 1059 (8th Cir. 1998)(citations omitted).

Rowley argues that the ALJ improperly determined his residual functional capacity (RFC) by erroneously discounting the credibility of his testimony. Rowley contends that the record is replete with references to his pain and fatigue, and that the existence and duration of these complaints and his efforts to obtain relief were ignored by the ALJ.

RFC is defined as what the claimant "can still do despite . . . limitations." 20 C.F.R. §§ 404.1545(a), 416.945(a). RFC is an assessment based on all "relevant evidence," *id.*, including observations by treating or examining physicians or psychologists, family, and friends; medical records; and the claimant's own description of his limitations. *Id.* §§ 404.1545(a)- (c), 416.945(a)-(c). *McKinney v. Apfel,* 228 F.3d 860, 863-64 (8th Cir. 2000). An ALJ may resolve conflicts among various treating and examining physicians, assigning weight to the opinions as appropriate. *Pearsall v. Massanari,* 274 F.3d 1211, 1219 (8th Cir. 2001). Both physical and mental limitations must be considered.

Whether the ALJ properly discounted Rowley's credibility is crucial. The credibility determination has bearing on the RFC determination made by the ALJ, which in turn was

relied upon by the VE in determining whether Rowley was capable of employment, whose opinions were used as the basis for the ALJ's decision that Rowley is not disable under the Act. It is well-established that a hypothetical question need only include those impairments and limitations found credible by the ALJ. *See Vandenboom v. Barnhart,* 421 F.3d 745, 750 (8th Cir. 2005)*, Forte v. Barnhart*, 377 F.3d 892, 897 (8th Cir. 2004).

***Credibility Determination.***

The Eighth Circuit Court of Appeals recently summarized an ALJ's duty with regard to assessing a social security claimant's credibility relative to subjective complaints.

> "A claimant's subjective complaints may be discounted if there are inconsistencies in the record as a whole. 20 C.F.R. § 404.1529, 416.929; *McKinney v. Apfel,* 228 F.3d 860, 864 (8th Cir. 2000); *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984)." *Guilliams v. Barnhart*, 393 F.3d 798, 801-802 (8th Cir. 2005).

>> Under *Polaski*, to evaluate [a claimant's] subjective complaints of pain, the ALJ, in addition to considering "[t]he absence of an objective medical basis which supports the degree of severity of subjective complaints," . . . **must examine** "the claimant's prior work record and observations of third parties and physicians relating to: (1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions.

*Schultz v. Astrue*, 479 F.3d 979, 983 (8th Cir. 2007)(citing *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006) *emphasis added*. Courts will defer to an ALJ's credibility findings "so long as they are supported by good reasons and substantial evidence." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005). "In discrediting subjective claims, the ALJ cannot simply invoke *Polaski* or discredit the claims because they are not fully supported by medical evidence. Instead, the ALJ must make an express credibility determination that

explains, based on the record as a whole, why the claims were found to be not credible."

*Dukes v. Barnhart*, 436 F.3d 923, 928 (8th Cir. 2006)(citing *Lowe v. Apfel*, 226 F.3d 969, 971-72 (8th Cir. 2000).

Therefore, the factual determinations upon which the ALJ based her credibility determination must be scrutinized.[1]   The ALJ began with the statement that "there is nothing in the file to show" that he is precluded from full-time work.  The ALJ noted that Dr. Taylon did not restrict him from light exertional work, and she stated that "objective findings have failed to substantiate the intensity and persistence of his symptoms," specifically noting the lack of evidence of nerve root impingement that might affect Rowley's ability to sit, stand and walk.  The ALJ's second reason for discounting Rowley's credibility was that he "failed to follow through on treatment recommendations" related to his physical therapy.  The third factual basis for discounting his credibility is that he has stated that he is able to

---

[1] With regard to Rowley's credibility,  the ALJ stated:

> [A]lthough the claimant does have medically determinable impairments, there is nothing in the file to show these conditions are so severe as to preclude the claimant from all full-time work activity.  Objective findings have failed to substantiate the intensity and persistence of his symptoms.  Although his reported difficulty sitting, standing and walking, there are no findings consistent with nerve impingement that would "reasonably" impair his ability to do so. . . .  [T]he claimant was referred to physical therapy to address his complaints of numbness and tingling in his extremities, but failed to follow through on treatment recommendations.  This would generally indicate that his symptoms were perhaps not as severe and debilitating as to what he testified.  He has stated he is able to perform certain routine household chores (i.e., vacuuming and tending to "kitchen duties") without significant difficulty, and is able to drive up to 50 miles before needing to stop and stretch.

(Tr. 24).

perform certain routine household chores and that he is able to drive up to 50 miles at a time.

The Court finds that substantial evidence in the record a whole does not support the ALJ's factual assertions upon which she discredited Rowley's testimony. The Court concludes these three reasons, in the absence of analysis of the other *Polaski* factors, are not good reasons to discount Rowley's credibility.  See generally *Beckley v. Apfel*, 152 F.3d 1056, 1060 (8th Cir. 1998)(rejecting the ALJ's conclusion that there was "no medically verifiable physical abnormality . .  to account for such pain" upon the findings that the claimant had many doctor visits, tried several treatment modalities, and underwent several diagnostic tests which sufficed to show "aggressive treatment").  The Court will reverse and remand this case to calculate the amount of benefits due to Rowley because the ALJ's findings are not based on substantial evidence and the ALJ failed to analyze the *Polaski* factors, specifically including those that relate to pain and medication.

The ALJ accurately observes that there is no clear evidence of nerve root impingement that would explain the weakness and numbness in Rowley's lower extremities.  The Court notes that his consistent ability to demonstrate 5/5 strength in his extremities does not support a finding of chronic pain of extended duration. Nevertheless, there is ample objective medical evidence by diagnostic tests and examination to support Rowley's complaints of severe pain.  For example, both cervical and lumbar MRI's show objective evidence that would support Rowley's complaints of pain. Rowley has degenerative changes throughout his spine.  He has had nerve root impingement in the cervical spine which required the fusion in 1999, and since 2000 there have been objective findings by MRI of spinal stenosis severe in places and moderate to severe in other places,

18

osteophyte, and possible desiccated disc fragments around the site of the fusion.  Since 2001, there has been evidence of degenerative disc disease at L4-S1, a broad based bulging disc at L4-5, with a likely annular rent (tear in the covering of the disc), and a bulging disc at L3-4.  There is also a diagnoses of "failed back surgery syndrome" made by the VA Pain Clinic physician, and a notation from the consulting physician Dr. McPherson and emergency physicians who noted tenderness and spasm in their examination notes.   While it is true that Dr. Taylon did not issue restrictions that would prevent Rowley from engaging in light exertion work, it is also abundantly clear for the medical records that Dr. Taylon evaluated Rowley for surgical intervention, and that Wagner and others at the VA Primary Clinic were responsible for his pain management.  For all these reasons, I find that the ALJ's statements relative to objective findings is not supported by substantial evidence.  Rather, there are significant and substantial objective findings that support the duration, severity and intensity of the pain Rowley described.

**Previous Work**

The ALJ found that Rowley had no prior work relevant work, but the record contains evidence that Rowley was previously employed with the City of Omaha at the time of his accident in 1996.  He has worked several jobs in construction, and most recently, he delivered newspapers.  Rowley has not reported all his income to the government as the ALJ noted, though it appears that he has worked in the past primarily as a laborer, and that he has not worked since the amended date of onset, September 30, 2002.

**Polaski Factors:  Daily Activities**

The ALJ also noted that Rowley stated that he is able to perform certain routine household chores, (i.e., vacuuming and tending to 'kitchen duties') without significant

19

difficulty, and is able to drive up to 50 miles before needing to stop and stretch. (Tr. 24). There is evidence from medical records, including the histories; his spouse; and his children to substantiate Rowley's testimony that he is unable to do ordinary household chores without assistance because of pain and weakness.  (Med. Recs. 4/019/13/03) There is evidence that he requires more sleep than is normal and has brought that concern to his physician.  (8/02) There is undisputed evidence that Rowley has experienced periods of up to approximately six weeks when his pain is under control.  (*See, i.e.* August and September 2002 ; May and June 2003, and February and March 2004.)  During those periods, he has been able to perform more household chores and activities of daily living. Setting aside those good periods, however, the medical records and statements of third parties support his claim that he has been unable to manage the daily activities of life. Rowley testified that he has trouble driving, because the required twisting and turning cause pain in his neck, and because the jostling of his body while riding on rough roads increases his back pain.  (Tr. 557, 560)  He has required assistance in reaching over head and below when he has attempted to cook, he has lost his grip and dropped things; he has been unable to walk or stand for long periods of time; he has had trouble lifting laundry baskets and carrying them any significant distance, and he requires frequent naps and much sleep.   *See Miller v. Sullivan*, 953 F.2d 417, 421 (8th Cir.  1992)(seeing no inconsistency in Miller's description of her good days and bad days.)  Substantial evidence does not support the ALJ's factual findings regarding Rowley's daily activities.

**Duration, Frequency, and Intensity of Pain**

There is evidence in the medical records that Rowley has endured intense pain that has lasted for several years without significant and sustained relief, and that the pain has

increased in intensity as the degenerative changes of his spine accelerate. The medical records undeniably demonstrate that, with exceptions that lasted sometimes for approximately six weeks, Rowley has been receiving medical care for persistent and progressively worsening pain in his neck and cervical area since the date of his injury in 1996 and surgery in 1999, and through the date of the hearing. Rowley has been proactive in attempting to manage the pain. In 2000, he returned to the VA Primary Care Clinic stating that he could no longer manage his pain with the 600 mg. of ibuprofen previously prescribed. At that time he was started on naproxen, and by the end of 2000 he was taking other narcotic pain relief.

The medical records demonstrate that Rowley often initiated contact with the VA Primary Care Clinic for refills of prescription pain medications and to discuss treatment options, including referral to the VA Pain Clinic. The record also demonstrates that medical personnel appreciated the existence, duration, and severity of Rowley's pain. For instance, his neurosurgeon, Dr. Taylon, recommended referral to a pain clinic; his treating PA Wagner finally referred Rowley to the VA Pain Clinic; and the VA Pain Clinic personnel discussed with him the value of a referral to a different pain clinic located in Florida. In addition, Dr. Stone who did the psychological evaluation of Rowley diagnosed that he experienced "depression secondary to the pain" which likely caused "some irritability in interpersonal situations at times and some decreased stress tolerance." (Tr.  403). Similarly, consulting physician Dr. Scott McPherson noted that Rowley might benefit from referral to a pain clinic.[2]

---

[2]   The ALJ's selective use of the record is seen by comparing what the ALJ summarized from Dr. McPherson's report, and what the ALJ chose to exclude. The ALJ summarized the physical examination information but did not include material conclusions

**Precipitating and Aggravating Factors**

The medical records contain evidence that precipitating and aggravating factors include activities such as lifting and driving.  Precipitating factors to increases in pain include the falls that he took in May and again in August 2004.

**Dosage, Effectiveness & Side Effects**

The medical records reveal that Rowley has taken strong pain medication in significant dosages since 2000, a year after the cervical fusion surgery. With regard to Rowley's medications, the ALJ simply identified the medications he was taking.  She listed 15 medications on page two of her report (Tr. 19).  The ALJ did not, however, analyze the dosage, note their effectiveness, or consider their side effects anywhere in her report.

For much of the time in question, Rowley has taken the medications related to the impairments identified in this case:

―――――――――――――――――

and comments made by Dr. McPherson at the end of his report, such as:

> [H]is pain is subjective, and objective evaluation shows definite limitation of range of motion in the cervical spine, though ambulation appeared to be normal.  *His comment of inability to drive and his difficulty with walking are reasonable.*  However, he showed no evidence of this on examination. Certainly, further evaluation and *possible treatment with some kind of pain clinic, perhaps injectable management would lessen his pain* and it is uncertain what kind of work he performed do if raising his arms and walking cause a great deal of pain for him.  *Driving, if it does cause him as much pain as indicated, to a job and returning from a job could be difficult for him.* There are medications that have not been attempted for his neuropathic type pain that could be beneficial.  However, his physicians would need to discuss this further with him.  There was no evidence of muscle atrophy.  In fact the patient was quite strong in all muscle groups.  Therefore, it appears that he has been continuing to be physically active to a certain degree."

(Tr. 395-396).

22

1.      Amitriptyline HCL -  (generic form of Elavil)  for pain control and sleep;

2.      Cyclobenzaprine HCL - (generic form of Flexeril) for control of muscle spasm and pain control;

3.      Diclofenac NA  - for pain from osteoarthritis;

4.      Gabapentin - (generic form of Neurontin) taken for neuralgia (nerve pain);

5.      Hydrocodone -  opioid analgesic for moderate to severe pain;

6.      Sertraline -  (generic form of Zoloft) anti depressant;

7.      Tramadol -  for acute pain; and

8.      Trazadone HCL  - anti depressant.

These medications have been associated with side effects including dizziness, drowsiness, somnolence, nausea, mental clouding, and head ache, to name just  a few.[3] The prescription medications that Rowley has used are strong medicines, and he has taken them over an extended period of time under a doctor's supervision.  The number of medications that Rowley has taken over time has generally increased, as has some of the dosage, i.e., Hydrocodone from 250 mg to 500 mg twice a day (from 10/8/02 to 2/17/04; Tr. 328, 498) and Gabapentin from two 300 mg capsules three times a day to two 400 mg capsules three times a day (from 7/9/03 to 2/17/04, Tr. 437, 498).   On the hearing date, Rowley testified that he takes approximately 20 pills per day.  The Court concludes that the ALJ's total failure to analyze the medications Rowley has taken constitutes reversible error in this case, which is primarily about the management of, or failure to manage, chronic pain.

---

[3] Descriptive information taken from medical records (including but not limited to Tr. 498) and RxList.com.

23

The facts of Rowley's case and the ALJ's treatment of the evidence that he presented can be distinguished from two relatively recent Eighth Circuit Court decisions that affirmed the Commissioner's conclusions that claimants' allegedly pain was not disabling.  For example, in *Schultz*, the Court found that "medications control Schultz's hypertension, nausea, and vomiting, and Schultz neither takes strong doses of pain medication nor experiences adverse side-effects . . .."  In *Pirtle v. Astrue*, 479 F.3d 931, 935 (8th Cir. 2007), the Court noted that the ALJ found the claimant "received sporadic treatment for joint pain and muscle spasms" and "medical records reveal[ed] only a minimal mention of musculoskeletal pain).  In those cases, the ALJs specifically analyzed the impact of the claimants' pain under *Polaski*.  In this case, there was no analysis of the prescription medications that Rowley took for pain; changes in the prescriptions; the dosage or changes in dosage of these medications over time; whether they actually alleviated his pain and if so, to what extent; and whether there were any known side effects such as drowsiness or nausea that otherwise affected Rowley's ability to engage in activities.

**Functional Limitations**

The final *Polaski* factor relates to functional limitations.  There is evidence that Rowley cannot lift and carry without aggravating the pain in his back.  Dr. Taylon restricted him from lifting more than 35 pounds, and from twisting and bending.  There is evidence that he has difficulty at times focusing and remembering, and he has testified that he has trouble sitting, standing, and walking for significant periods of time.

24

**Resolution**

Even though the ALJ cited *Polaski*, I conclude that she did not perform a proper *Polaski* analysis. The ALJ's conclusion that there is no support in the record, including in the objective medical evidence, to support Rowley's claim of serious, disabling pain is not supported by substantial evidence in the record as whole. In discrediting Rowley's testimony, the ALJ also made findings regarding his daily activities and his failure to follow through with physical therapy treatments that were not supported by substantial evidence.

Though the ALJ stated that the record did not support Rowley's claims regarding the duration, severity and intensity of his pain, she did not support that conclusion with facts. The Court concludes that the ALJ failed to make a finding regarding the duration, severity and intensity of his pain based on the evidence. Indeed, there is substantial evidence in the record to support a finding that Rowley had severe disabling pain from 2000-2004, and that even with the assistance of several prescription medications, Rowley's pain was not managed well enough for him to engage in sustained gainful activity.

The ALJ did not address whether there were precipitating and aggravating factors, including two falls recorded in the medical records in 2004, that contributed to or detracted from his credibility.

Finally, while the ALJ identified Rowley's modalities of treatment, including the listing of 15 prescription medications that he had taken during the period from 2000 through the hearing date, the ALJ failed to analyze the dosage, effectiveness, or side effects of the medication. The Court specifically finds this failure is reversible error. The ALJ's failure to address the use of prescription medications and their side effects likely shortchanged the analysis of Rowley's activities of daily living. The known side effects of some of the

25

medications are consistent with Rowley's complaints of day-time sleepiness and fatigue and his spouse's testimony relating to Rowley's inability to focus and memory problems. (Tr. 568-69).

The VE was asked to assume that Rowley's testimony was credible.  Given that assumption, Rowley's counsel asked the VE to give his opinion on whether Rowley could perform unskilled light or sedentary work given the symptoms he had described at the hearing, and the VE responded: "I don't think he could on a consistent basis."  (Tr. 577). The VE explained that Rowley testified that he had trouble sitting for any long period of time,  that he had difficulty looking up and looking down, and moving his head from side to side, and that the unpredictability of his discomfort would cause him to miss approximately 10 days of work per month, which would prevent him from holding a job. (*Id.*)

The record reflects that Rowley's use of prescription pain medications was being monitored by his health care providers, and the prescriptions were routinely refilled and, when necessary, different medications were attempted to provide pain relief. His health care professional recommended physical therapy, which Rowley attempted but found not to be effective for long-term relief, and they recommended his participation in a pain clinic, which Rowley attended and through which he found some relief with the treatment of the nerve pain prescription, Gabapentin.

Because I conclude that the ALJ failed to conduct a proper *Polaski* analysis and made her credibility determination based on evidence that did not support the determination, this matter will be remanded.  The Court concludes, however, that substantial evidence supports a finding that Rowley is disabled under the Act.  Therefore,

an order of remand to grant benefits will be entered.  *See Beckley v. Apfel*, 152 F.3d 1056, 1060 (8th Cir. 1998) (noting that "where the record itself 'convincingly establishes disability and further hearings would merely delay receipt of benefits, an immediate order granting benefits without remand is appropriate.' *Cline*, 939 F.2d at 569 (citing *Jeffery v. Secretary of H.H.S.,* 849 F.2d 1129, 1133 (8th Cir. 1988.)") *Accord Thomas v. Apfel*, 22 F.Supp.2d 996, 999 (S.D. Iowa 1998) (where claimant is unable to do any work in the national economy, remand to take additional evidence would only delay receipt of benefits to which claimant is entitled, warranting reversal with award of benefits).

IT IS ORDERED:

1.      The Plaintiff's appeal is granted;

2.      The decision of the Commissioner is reversed, and this matter is remanded to the Commissioner for an award of benefits; and

4.      Judgment in favor of the Plaintiff, Ernest Rowley, Jr. will be entered in a separate document.

DATED this 21st day of May, 2007.

BY THE COURT:

s/Laurie Smith Camp
United States District Judge

27